**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**In the Matter of the Extradition of**

**Zhenly Ye Gon**                                                      **Misc. No. 08-596 (JMF)**

**MEMORANDUM OPINION**

In this extradition proceeding, defendant has made many arguments that he claims
preclude his extradition to Mexico.  In my view, it is necessary to resolve many of the issues he
raises before the hearing so the hearing can be directed to the precise issue that will
remain–probable cause–once all the other issues are resolved.

I.      Staying the Proceedings to Await the Resolution of the Criminal Case Against the
        Defendant in this Court

The defendant has been indicted in this Court in Criminal Case No. 07-181 and seeks an
"indefinite deferral" of this extradition. See [#25].[1]  That would mean that, at a minimum,
proceedings on the extradition would be stayed until the conclusion of his jury trial, presently
scheduled to begin June 22, 2009 before Judge Sullivan.

Whatever advantages or disadvantages might accrue from such a stay, it is clear that the
Treaty provides that the extradition proceedings should proceed first and that the party which has
custody of the defendant, the "Requested Party," may, after granting the extradition, defer the
surrender of the person sought until the conclusion of the criminal proceedings in the state of the
Requested Party or "the full execution of the punishment that has been imposed." Extradition

---

[1] Defendant's filings in this case lumber under such hopelessly long and tangled captions
that I will refer to them by number.

Treaty, U.S.-Mexico, May 4, 1978, 31 U.S.T. 5059, Art. 15 ("Treaty").

The Treaty therefore requires that the extradition proceeding go forward, despite the pendency of criminal proceedings in the courts of the "Requested Party," i.e. the United States. Once it is completed and, if successful, the executive branch will then decide whether it should be deferred pending the conclusion of the criminal case before Judge Sullivan, to include the defendant's serving whatever sentence Judge Sullivan may impose.  Cf. Sindona v. Grant, 619 F.2d 167, 176 (2d Cir. 1980).

II.   Request for Bail

Defendant requests that he be admitted to bail.  It is, however, unnecessary to reach the question of his possible entitlement.  The defendant is being held without bond in the matter before Judge Sullivan and a detainer has been filed against him by the Immigration and Customs Enforcement Agency.  Simply put, he cannot be released.  Indeed, if I were to order him released, he would remain in custody and might lose credit for the time he will have served in this case.  I will therefore save him from his own improvidence and deny his request for bail.

III.   Warrant for Arrest

Defendant challenges the sufficiency of the showing made before this Court issued a warrant for his arrest, arguing that it did not establish probable cause.  The Treaty, however, does not require that any showing of probable cause be made before a provisional arrest warrant issues.  Instead, the application need only contain (a) a description of the offense for which the extradition is requested; (b) a description of the person sought and his whereabouts; (c) an undertaking to formalize the request for extradition; and (d) a declaration of the existence of a warrant for arrest issued by a judge or a judgment of conviction against the person sought.

2

Treaty, Art. 11, ¶ 1.

In this case, the defendant was in custody in the United States and there was no need for a provisional arrest warrant. Instead, the government of Mexico provided a 604 page single-spaced document that sets out the detailed determinations made by the Mexican judge who issued the warrant and the evidence upon which he relied. If the upcoming hearing establishes that the previous showing was sufficient to establish probable cause, then the warrant was most certainly based on probable cause. If not, the defendant will be released irrespective of the validity of the issuance of the warrant. Therefore, defendant's attack on the warrant need not be considered.

IV.     Motive, Persecution, and Torture

The defendant, citing the fact that in the extradition papers he is described by certain persons as "El Chino," the Chinaman, claims that he has been victimized by racial discrimination and that he will be tortured if extradited. Any claim that the prosecution in Mexico is improperly motivated or that he will be tortured can only be addressed by the Secretary of State, once this Court fulfills its narrow obligation to ascertain whether Mexico has shown probable cause for the defendant's arrest. Ordinola v. Hackman, 478 F.3d 588, 604-05 (4th Cir.), cert. denied, 128 S. Ct. 373 (2007); Hoxha v. Levi, 465 F.3d 554, 563-64 (3d Cir. 2006).[2]   See also Munaf v. Geren, 128

---

[2] As Judge Bates has stated:

> Counseling even further against judicial interference in the transfer of detainees to other countries is a well-established line of cases in the extradition context holding that courts will not conduct an inquiry into "the procedures or treatment which await a surrendered fugitive in the requesting country." United States v. Kin-Hong, 110 F. 3d 103, 110 (1st Cir. 1997) (quotation omitted). Known as the "rule of non-inquiry," this doctrine is "shaped by

S. Ct. 2207, 2225 (2008) (concern that transfer of petitioners to Iraqi custody would lead to torture was serious but was to be addressed by the political branches, not the judiciary); <u>Kiyemba v. Obama</u>, 561 F.3d 509, 514 (D.C. Cir. 2009).

V.      <u>Political Question</u>

Article 5 of the Treaty provides the following: "Extradition shall not be granted when the offense for which it is requested is political or of a political character." Treaty, Art. 5, ¶ 1.  Using an unfortunate "kitchen sink" approach, defendant, charged in Mexico with drug, firearm and money laundering offenses, attempts to avail himself of this exception.  Defendant's counsel asserts:

> Pursuant to both the treaty and Convention, an Extradition being politically motivated shall be barred.  Petition should be dismissed. As a matter procedures, the U.S. prosecutors may need to show cause to this Honorable Court why this Mexican Extradition request against "El Chino" should not be returned to Mexican Government for impermissible mis-identification as well as for apparent racial discrimination.  Noticeably, in deciding the issue of

---

> concerns about institutional competence and by notions of separation of powers," and stands for the general proposition that "it is the function of the Secretary of State–not the courts–to determine whether extradition should be denied on humanitarian grounds." <u>Kin-Hong</u>, 110 F.3d at 110; <u>Sidali v. INS</u>, 107 F.3d 191, 195 n.7 (3d Cir. 1997); <u>see also</u> <u>Ahmad v. Wigen</u>, 910 F.2d 1063, 1067  (2d Cir. 1990) ("The interests of international comity are ill-served by requiring a foreign nation … to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced."); <u>Escobedo v. United States</u>, 623 F.2d 1098, 1107 (5th Cir. 1980) ("The degree of risk to [Escobedo's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch.") (citations and quotations omitted).

<u>Abdulla Thani Faris Al-Anazi v. Bush</u>, 370 F. Supp. 2d 188, 195 (D.D.C. 2005) (footnotes omitted).

4

> sufficiency of extraditibility, according to both the Treaty and the
> Convention, it is the law of the requested State which governs.
>
> The law of the United States has long outlawed any racial
> discrimination, such as using humiliating and insulting racial slur
> to misidentify the suspect of alleged criminality.

[#25] at 8.

This statement confuses an offense of a political character with the supposed motivation of the demanding State and seems to argue that, since American law prohibits racial discrimination, a discriminatory motive renders the crimes charged in Mexico "political." That is absurd and, as just explained, the demanding State's motive in seeking extradition (assuming it could be divined) is irrelevant.

In any event, to invoke the exception in the treaty, defendant has to show that at the time of the alleged offense there was a violent political disturbance such as war, revolution, or rebellion and that the offense was committed in the course of and incidental to the violent political disturbance. Ordinola, 478 F.3d at 611 (Traxler, J., concurring) ("Virtually every court to encounter the question of whether the alleged crime is a relative political offense has applied this two-pronged test."). See, e.g., Barapind v. Enomoto, 400 F.3d 744, 750 (9th Cir. 2005) (en banc) ("To determine whether the political offense doctrine bars extradition, we apply a two-prong incidence test. For a crime to qualify as one of a political character . . . there must be: (1) the occurrence of an uprising or other violent political disturbance at the time of the charged offense, and (2) a charged offense that is incidental to in the course of, or in furtherance of' the uprising.") (internal quotations omitted); Escobedo v. United States, 623 F.2d 1098, 1104 (5th Cir. 1980) ("This circuit defines a political offense under extradition treaties as an offense committed in the

course of and incidental to a violent political disturbance, such as war, revolution and rebellion. An offense is not of a political character simply because it was politically motivated.") (citations omitted).  Obviously, defendant cannot even pretend to meet these requirements.

VI..    <u>Non Bis In Idem</u>[3]

Article 6 of the Treaty provides: "Extradition shall not be granted when the person sought has been prosecuted or has been tried and convicted or acquitted by the requested Party for the offense for which extradition is requested." Treaty, Art. 6.

Defendant attempts to avail himself of this provision but, as the government correctly points out, the Article is phrased in the past tense ("has been prosecuted").  Phrased as it is in the past tense, the words "has been prosecuted" should not be interpreted to "encompass the yet-to-be completed criminal case in the United States." <u>Memorandum in Opposition to Ye Gon's Preliminary "Explanation" and Motion to Vacate Order of Arrest</u> ("Gov's Opp.") at 20.

The government's point that the words "has been prosecuted" should not extend to a case yet to be tried has much to recommend it.  Under any other interpretation, the words "has been prosecuted" means that a criminal prosecution need only to have been initiated in the Producing State and that its mere existence precludes the extradition for that same offense.  Attributing that intent to the signatories is strange for it would attribute to the signatories an intention to provide a protection that is certainly much greater than is, for example, provided to a defendant in the United States who, to invoke the double jeopardy clause, must first be placed in jeopardy by the impaneling of a jury. <u>United States v. Andrews</u>, 146 F.3d 933, 941 (D.C. Cir. 1998).  Moreover, as a matter of domestic law, there is no provision in American law that precludes prosecution by

---

[3] "Not twice for the same thing." BLACK'S LAW DICTIONARY 1051 (6th ed. 1991).

one sovereign merely because another sovereign has initiated a prosecution.  Yet, if the tense of

the words "has been prosecuted" is ignored, it would mean that the signatories meant to preclude

a prosecution because each sovereign had, for example, issued a complaint or indictment for the

defendant for "the offense for which extradition is requested."  A defendant would thereby be

protected from prosecution and extradition merely because both sovereigns issued arrest warrants

or indicted the defendant for the same offense.  Interpreting the words "has been prosecuted" to

mean the culmination of the prosecution by conviction or acquittal avoids that unnatural result.

By the same token, a treaty is a contract between countries and, if possible, every word of

their agreement must be given effect.  See Iceland S.S. Co., Ltd.-Eimskip v. U.S. Dep't of Army,

201 F.3d 451, 458 (D.C. Cir. 2000).  The words "has been prosecuted" appear in addition to the

words "has been tried and convicted or acquitted by the requested state," suggesting that the

phrase "has been prosecuted" must mean something other than being tried or acquitted.  The nice

question of its exact meaning can be avoided in this case because, even if the two charging

instruments in themselves trigger the protection of this Article, it is clear beyond all question that

they do not charge the same offenses.

As the government suggests, a Blockburger[4] analysis that inquires whether the two

offenses claimed to be the same for the purposes of the double jeopardy clause contains the same

elements provides a principled manner of resolving that question, particularly since it can be

based on familiar case law that protects the same interest as the Article in question–protecting a

person from two prosecutions for the same crime.  In Rezaq v. United States, 134 F.3d at 1121,

---

[4] Blockburger v. United States, 284 U.S. 299, 304 (1932).  See, e.g., United States v.
McLaughlin, 164 F.3d 1 (D.C. Cir. 1998), cert. denied, 526 U.S. 1079 (1999).

1127-28 (D.C. Cir. 1998), <u>cert. denied</u>, 525 U.S. 834 (1998), the court of appeals used the

<u>Blockburger</u> analysis to reject a claim by a defendant who was prosecuted in the United States that

he had already been convicted of the same offense in Malta.  There is every reason to suppose

that, confronted with the identical question here, the court of appeals would use the same analysis

in interpreting the words "for the offense for which extradition is requested."  Moreover, since

neither prosecution has yet culminated in a trial, this court can only compare the elements of the

crimes charged.

      The Mexican charges are as follows:

1.     Participation in organized crime, for the purpose of repeatedly committing drug crimes and
    operations with illegal funds;

2.     Drug-related offenses in the forms of:

    a.     importation into Mexico of psycho tropic substances, namely, N-acetyl
    pseudoephedrine acetate and ephedrine acetate, derivatives of
    pseudoephedrine,

    b.     transportation of psycho tropic substances, namely, N-acetyl pseudoephedrine, a
    derivative of pseudoephedrine,

    c.     manufacture of psycho tropic substances, namely, pseudoephedrine, ephedrine,
    pseudoephedrine hydrochloride, and methamphetamine hydrochloride,

    d.     possession of psycho tropic substances for the purpose of producing narcotics,

    e.     diversion of essential chemical products, namely sulfuric acid, to produce
    narcotics;

3.     Violations of the Federal Law on Firearms and Explosives in the form of possession of

firearms reserved for the exclusive use of the Army, Navy and Air Force; and

4.      Money laundering, by himself or through an intermediary, by having custody of funds

within Mexico, knowing that the funds have their source in an illegal activity, with the

intention to impede knowledge of their source, location, destination, or ownership.

See Aff. ¶ 19; Apdx. A [Mexican arrest warrant] at 636-39.

The United States indictment, on the other hand, charges a single count of conspiring to

aid and abet the manufacture of 500 grams or more of methamphetamine, knowing that it was to

be imported into the United States from Mexico. United States v. Zhenly Ye Gon, Cr. No. 07-181,

Indictment, Count One.

The Mexican statutes on which the warrant is based are attached to the government's

submission.  An examination of them and of the submission by the Mexican government first

establishes, as the government correctly points out, that the Mexican firearms and money

laundering charges have no elements in common with the American conspiracy charge

whatsoever.  See Gov's Opp. at 22.

As the government also correctly points out, the American crime of conspiracy is complete

upon an agreement between the co-conspirators while the Mexican charges are dependent upon

proof of the acts condemned in the statutes, i.e., that the individual imported, transported,

manufactured, or possessed with intent to distribute the controlled substances at issue. Id.

Additionally, under Mexican law, the government would have to show that the defendant did not

have the permission of the Mexican government to perform these acts.  Such a showing is not

necessary to establish his guilt regarding the American charges.  Thus, the two sets of charges do

not have any elements in common.  Defendant's assigning significance to both governments'

finding proof of their charges in the same documentary evidence[5] is besides the point.  That the

charges may be proved by the same evidence does not render them the same.

VII.    <u>Defendant is Not Entitled to the Discovery He Seeks</u>

The submission the Mexican government had made in support of its demand for the

defendant's extradition is crucial to understanding the nature of the discovery the defendant seeks.

A.      <u>The Mexican Government's Submission</u>

According to the affidavit of Jorge Joaquin Diaz Lopez, Coordinator General of

Investigations assigned to the Specialized United of Drug Crimes,[6] that was submitted in support

of Mexico's request for extradition, Unimed Pharm Chem ("Unimed"), a company controlled by

the defendant, legally imported 33,875 tons of ephedrine, pseudoephedrine and pseudoephedrine

hydrochloride with permits issued by an agency of the Mexican government called "COFERIS."

Lopez Aff. ¶ 37.

On September 24, 2003, a Chinese company contracted to sell to Unimed a chemical that

was intended to be used, according to the contract, to produce pseudoephedrine. <u>Id.</u> ¶ 39.   The

Chinese company was obliged by the contract to provide technical support to aid Unimed in the

production of pseudoephedrine, to include "workshop housing design." <u>Id.</u>  The Mexican

government therefore charges that the contract contemplated the construction of a factory that

would produce the pseudoephedrine. <u>Id.</u>

In 2004, however, the Mexican government, in compliance with a 1988 United Nations

Convention that regulates trafficking in the precursors of methamphetamine, determined that there

_____

[5] [# 22] at 22.

[6] Hereafter "Lopez Aff."

10

was being imported into Mexico much more ephedrine and pseudoephedrine than was needed for medical purposes and that the excess was being diverted into the black market. Id. ¶ 43. Accordingly, the Mexican government (1) prohibited the use of the Port of Lazaro Cardenas as a custom port to import psycho tropic substances; (2) reduced the amount of ephedrine pseudoephedrine that was permitted to be imported by 40%; and (3) prohibited the importation of the precursors of methamphetamine by 40%. Id. ¶ 44.

On July 1, 2005, the Mexican Secretary of Health, acting through COFERIS, eliminated Unimed as an authorized importer of ephedrine and pseudoephedrine. Id. ¶ 45. Unimed was permitted to sell what it had on hand. Id. ¶ 45 n.4. Thus, once the existing stock was sold, Unimed's importation of ephedrine and pseudoephedrine was rendered illegal. Id.

The Mexican government then charges that Unimed began to operate a processing factory, contemplated by the contract with the Chinese company, in Toluca, Mexico. Id. ¶¶ 53-56. On December 5, 2005, a shipment of 20,000 kilograms arrived at the port of Manzanillo. Id. ¶ 63. The chemicals were described as "N-Methly-Acetilamino." Id. The shipment was stopped at Customs, however, and the Mexican authorities took samples and ascertained that the documents were false; the substance in the drums was not N-Methly-Acetilamino but "N-Acetyl Pseudoephedrine." Id. ¶ 65. According to the Mexican Customs chemical expert, when N-Acetyl Pseudoephedrine is processed using heated hydrochloric acid, it yields pseudoephedrine hydrochloride "which is used for the clandestine formulation of amphetamines." Id.

On January 3, 2006, another shipment of 29,400.05 kilos arrived from Hong Kong. Id. ¶ 66. Once again, the contents were described as N-Methly-Acetilamino in a document certified by one of the defendant's employees and once again a chemical analysis by Mexican Custom

Authorities indicated that the substance was not as represented but was the same precursor as the one in the December shipment, used in the clandestine formulation of amphetamines. Id. ¶ 68.

On July 3, 2006, another shipment arrived from Hong Kong from the same exporter ("Emerald Import & Export Co.") with the same false certification by the defendant's employee and with same results by chemical analysis–the shipment contained a precursor used to manufacture amphetamines. Id. ¶¶ 72-76. This occurred again with more shipments in 2006. Id. ¶¶ 120-124. Notably, the shipments were destined for the defendant's manufacturing plant in Toluca. Id. ¶¶ 74-75.

The Lopez affidavit then details the evidence from Unimed employees as to the manufacturing and the use of cash in payment for nearly all of the Unimed transactions with its purchasers and suppliers. Id. ¶¶ 77-108. The employees also explained how the defendant shipped extraordinary amounts of money to foreign bank accounts. Id. ¶¶ 104-105. The American Drug Enforcement Agency reported that records from American casinos in Las Vegas, Nevada, showed that the defendant had paid over $125,000,000 to those casinos. Id. ¶ 106.

In December, 2006, the Mexican police intercepted still another shipment from the Emerald Import & Export Co. that was once again falsely certified to contain Hydroxy Benzyl N-Methyl Acetethamine and was on its was to the plant in Toluca when a chemical analysis established that it was not as represented. Id. ¶ 122.

Finally, on March 14, 2007, a Mexican court issued search warrants for the defendant's home and the Toluca factory. Id. ¶ 131. At the defendant's home, the Mexican police found a staggering amount of money, including (1) 205,564,763 U.S. Dollars; (2) 201,460 Euros; (3) 17,306,520 Pesos; (4) 113,260 Hong Kong Dollars; and (5) 180 Canadian Dollars. Id. ¶ 134.

They also found various weapons whose possession is illegal under Mexican law. Id. ¶ 136.

The police also searched the Toluca factory, taking samples from the machines, tanks, barrels and bags that had been described by defendant's employees as the place where they produced over 600 kilos daily of a "white crystalline powder." Id. ¶ 138.  In the analyzed samples, the Mexican chemical experts identified the presence of "Ephedrine, Pseudoephedrine and Ephedrine Acetate, as well as Methamphetamine Acetate, which are substances defined as Psycho tropics by the General Health law." Id.  "In addition, the first three substances are considered to be essential chemical precursors of methamphetamine" under Mexican law. Id.

B.     The Discovery Sought

In a letter dated December 19, 2008,[7] defendant's counsel asked for the following materials:

1.     The Unimed log book in which it is said "controlled substance transactions were recorded pursuant to Mexican and international law." Letter at 1.

2.     COFEPRIS Log Book, said to be "the log book maintained by COFEPRIS pursuant to Mexican and international law, in which Unimed controlled substance transactions have been recorded and compared to Unimed's own log book when audits of the company were performed." Id.

3.     Minutes of a meeting held in July, 2005 at which Mexican authorities advised importers of controlled substances of the change in Mexican law, described above, pertaining to the importation of pseudoephedrine. Id. at 2.

---

[7] The letter is the attachment to the Notice of Filing, filed as [#29] on December 19, 2008. I will refer to it as "Letter."

13

4.      Samples from the seized shipments and reports of results by Mexican authorities.
        <u>Id.</u>

5.      The March 2007 warrant and supporting affidavits and supporting affidavits for the
        June/July 2007 warrant. <u>Id.</u> at 2-3.

6.      Any documents that would tend to negate probable cause. <u>Id.</u> at 3.

7.      Documents pertaining to a meeting between then President Bush and Mexican
        President Calderon on March 1, 2007. <u>Id.</u>

The government resists all this discovery.  <u>See</u> <u>Reply to Ye Gon's Response to Government's Opposition to Discovery Requests</u> at 7-22.

C.      <u>Discovery in an Extradition Proceeding</u>

In attempting to ascertain what if any discovery the defendant is entitled to in an extradition hearing, the Court must begin with the reality that in exercising the power granted by what is now 18 U.S.C. § 3184,[8] the magistrate judge is not exercising the judicial power of the United States under Article III of the Constitution.  Instead, the magistrate judge is exercising a special authority delegated to the judiciary by Congress, namely the authority to decide whether to certify extraditability to the Secretary of State, who holds the ultimate power to extradite at her discretion. <u>Austin v. Healey</u>, 5 F.3d 598, 603-04 (2d Cir. 1993), cert denied, 510 U.S. 1165 (1994); <u>see also</u> <u>In re Mackin</u>, 668 F.2d 122, 125-30 (2d Cir. 1981) (orders certifying extraditability are non-appealable because they do not emanate from constitutional courts); Jacques Semmelman, <u>Federal Courts, the Constitution, and the Rule of Non-Inquiry in</u>

---

[8] All references to the United States Code or the Code of Federal Regulations are to the electronic versions that appear in Westlaw or Lexis.

International Extradition Proceedings, 76 Cornell L. Rev. 1198, 1206-09 (1991).

It therefore has to follow that "an extradition hearing is not a criminal prosecution . . ."

Austin, 5 F.3d at 603.  Since it is not, one is hard pressed to understand why the obligation to

produce exculpatory evidence would apply.  See United States v. Bowie, 198 F.3d 905, 912 (D.C.

Cir. 1999) ("[I]t is hardly clear that the Brady[9] line of Supreme Court cases applies to suppression

hearings.  Suppression hearings do not determine a defendant's guilt or punishment, yet Brady

rests on the idea that due process is violated when the withheld evidence is 'material either to guilt

or to punishment,' 373 U.S. at 87,").  Moreover, even in the Circuit that applied the Brady

obligation to a certain and notorious extradition,[10] the court of appeals made it clear that the

obligation could only be imposed on the United States and its attorneys and not on the demanding

state.  The Sixth Circuit stated:

> In accordance with Demjanjuk, the United States was obliged to
> turn over any exculpatory materials in its possession that would
> undercut a finding that there was probable cause to believe that
> petitioner committed the murder with which Canada had charged
> him.  This obligation does not apply to Canadian authorities,
> however.  See Austin v. Healey, 5 F.3d 598, 605 (2d Cir.1993)
> (country requesting extradition has no obligation to try case in
> United States).  Accordingly, to the extent that petitioner's motion
> for discovery included requests for materials in the possession or
> control of Canada, it was properly denied.  The United States does
> not have any obligation or authority to obtain these materials on
> behalf of petitioner.  An extradition proceeding is not a forum in
> which to establish the guilt or innocence of the accused; rather, the
> sole inquiry is into probable cause.

In re Extradition of Drayer, 190 F.3d 410, 415 (6th Cir. 1999), cert. denied, 528 U.S. 1176

---

[9] I.e., Brady v. Maryland, 373 U.S. 83 (1963).

[10] Demjanjuk v. Petrovsky, 10 F.3d 338 (6th Cir. 1993) cert. denied, 513 U.S. 914 (1994).

(2000).

Furthermore, the Court's authority to order any discovery in an extradition case rests on an unclear theoretical basis.  First, the Federal Rules of Criminal Procedure, that contain a discovery provision in Rule 16, do not apply to "the extradition and rendition of a fugitive" Fed. R. Crim. P. 5(a).  Second, without the express approval of the Supreme Court, courts have nevertheless asserted an "inherent authority" to order discovery in extradition.  E.g., Prasoprat v. Benov, 421 F.3d 1009, 1014 (9th Cir. 2005) (and cases cited therein), cert. denied, 546 U.S. 1171 (2000).  None, however, have considered whether that asserted authority is consistent with the exclusion contained in Rule 5(a).

In any event, the right to discovery could at most extend to the United States itself just as the obligation to produce exculpatory evidence extends only to the United States, not the demanding state. In re Extradition of Drayer, 190 F.3d at 415.  I will determine at the hearing whether the United States has only performed the ministerial obligation to file with the Court whatever has been transmitted to it by the Mexican government.  If that is so, it has no obligation to produce anything else.  *Nemo dat quod non habeat*; it cannot give what it does not have.

Additionally, it cannot be suggested that an American defendant is entitled to discovery before a preliminary hearing[11] or before the presentation of evidence against him to a grand jury. Yet, if a defendant whose extradition is sought gets such discovery, he would be accorded a right that is not available to him under American law.  One is hard pressed to understand how there can be attributed to the signatories the intent to confer upon such a defendant a right that he

---

[11] Note a defendant is entitled to the statement of any witness who testifies at the preliminary hearing after the witness testifies. Fed. R. Crim. P. 5.1(h)(1).

would not have if he was being prosecuted by the Requested Party.  Moreover, there is not a single case in which a court imposed a discovery obligation upon the demanding state as a condition of extradition.  The lack of such authority is understandable.  Imposing such an obligation imposes on the signatories an obligation that they never undertook.

Finally, defendant's demands for discovery would fail even if this Circuit were to ultimately conclude that limited discovery from the United States itself may be permitted in an extradition matter.  First, as to the specific discovery demands at issue in this case, the log books demanded by request numbers one and two would in no way negate the Mexican government's evidence that on numerous occasions Unimed falsely certified the contents of a particular shipment and received precursors of the illegal substances that it then manufactured in the plant in Toluca.  That on a given day, Unimed accounted for its transactions of controlled substances or had its supplies audited does not in any way negate the evidence of illegal importation, manufacturing, and money laundering.

Second, the minutes of a meeting in which the Mexican government announced a change in its law cannot possibly negate the showing of the criminal behavior in the illegal importation of the precursors of illegal controlled substances, the manufacturing of those substances, or the laundering in foreign banks and exchanges of the extraordinary amounts of money at issue.

Third, samples from the seized shipment, assuming they are available, would tend to contradict the Mexican government's proof, rather than establish a lack of probable cause.  Evidence that goes to guilt or innocence or tends to contradict the requesting party's case is not admissible at the extradition hearing. Barapind, 400 F.3d at 749; Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1406 (9th Cir. 1988), cert denied, 490 U.S. 1106 (1989); Emami v. United States

District Court, 834 F.2d 1444, 1452 (9th Cir. 1987); Media v. United States, 667 F.2d 300, 302

(2d Cir 1981) ("An extradition hearing is not the occasion for an adjudication of guilt or

innocence."); Germany v. United States, No 06-CV-01201, 2007 WL 2581894, at *8 (E.D.N.Y.

Sept. 5, 2007) ("A defendant who challenges extradition is limited to evidence which explains,

rather than contradicts, the government's proof."); see also United States v. Kember, 685 F.2d

451, 456 (D.C. Cir. 1982), cert. denied, 459 U.S. 832 (1982).  Thus, whatever "right" the

defendant can claim to discovery, the courts that have permitted it have never extended the right

to evidence that would contradict the demanding state's showing because such evidence is

ultimately inadmissible at the extradition hearing.  In any event, American courts proceed on a

daily basis to findings of probable cause without full and complete chemical tests of the

substances seized from the defendant.  The Mexican authorities tested the various shipments on

each occasion and then tested what they found in the plant.  The notion that they were wrong

every time they did this is fanciful and it would be an abuse of discretion for me to order its

production of the tests in the absence of some reason to think that the chemical experts of the

Mexican government were repeatedly mistaken in their analyses.

Fourth, the contents of the 2007 search warrant and the affidavits filed in support of it

would be useless to the defendant if they were consistent with the representations made in this

case by the Mexican government.  If they were contradictory, they would be inadmissible at the

hearing since their only purpose would be to contradict Mexico's proof.

Fifth, the request for "any documents that would tend to negate probable cause" is a

vague "kitchen sink" approach that I cannot in fairness order without defendant being more

specific as to what he wants.

Sixth, records of a meeting between the two Presidents would, at most, go to the motive of the Mexican government in seeking extradition and, as I have already explained, Mexico's motive in seeking the defendant's extradition is irrelevant.

Defendant's request for discovery is therefore denied.

### Conclusion

All of the defendant's legal objections to the extradition having been rejected, a hearing date is set for May 15, 2009.  The treaty between the United States and Mexico requires extradition upon a showing that "the evidence be found sufficient, according to the laws of the requested party . . . to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place . . ." Treaty, Art. 3.  In the United States, a showing of probable cause suffices for a preliminary hearing or indictment by a grand jury.  See Fed. R. Crim. P. 5.1(e).  That is the standard that should be applied in this matter.  The hearing will therefore be strictly limited to whether the submission by the Mexican government establishes probable cause to believe that the defendant[12] committed the crimes charged by that government.

An Order accompanies this Memorandum Opinion.

_____/S/_____

JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

Dated:  May 13, 2009

_____

[12] There is no need for a separate identity hearing.