# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Extradition of           Misc. No. 08-596 (JMF)
Zhenly Ye Gon,
       a/k/a Zhenli Ye Gon,
       a/k/a Zhenli Ye,
       a/k/a El Chino.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case is before me for a certificate of extraditability. On September 15, 2008, the United States, acting on behalf of the Government of the United Mexican States ("Mexico"), pursuant to its formal request for the extradition of Zhenly Ye Gon ("Ye Gon"), filed a complaint. Complaint For Arrest With a View Towards Extradition (18 U.S.C. § 3184) [#1] ("Compl."). Hearings were held before me on February 2, May 14, and June 3, 2010.

## BACKGROUND

Extradition proceedings are governed by 18 U.S.C. § 3184, *et. seq.*,[1] and the terms of the extradition treaty between the country requesting extradition and the country in which the individual is found – here, the extradition treaty between Mexico and the United States. See Extradition Treaty, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059, T.I.A.S. No. 9656 ("Treaty"). When presented with a complaint for extradition, by statute, a judge or magistrate judge must hold a hearing to consider the evidence of criminality presented by the requesting country and to determine whether it is "sufficient to sustain the charge[s] under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. If the judge finds the evidence sufficient, he or she

---

[1] All references to the United States Code or the Code of Federal Regulations are to the electronic versions that appear in Westlaw or Lexis.

must "certify the same" to the Secretary of State, who makes the final decision whether to surrender the individual "according to the stipulations of the treaty." Ward v. Rutherford, 921 F.2d 286, 287 (D.C. Cir. 1990). Significantly, "[a]n extradition hearing is not the occasion for an adjudication of guilt or innocence." Messina v. United States, 728 F.2d 77, 80 (2d Cir. 1984) (internal quotation marks and citations omitted). Rather, it is a preliminary examination, similar to that conducted by a magistrate judge in the context of a criminal defendant being held on a domestic charge,[2] "to determine whether a case is made out which will justify the holding of the accused and his surrender to the demanding nation." United States v. Kember, 685 F.2d 451, 455 (D.C. Cir. 1982), cert. denied, 459 U.S. 832 (1982).

An extradition certification is in order, therefore, where: 1) the judicial officer is authorized to conduct the extradition proceeding; 2) the court has jurisdiction over the fugitive; 3) the applicable treaty is in full force and effect; 4) the crimes for which surrender is requested are covered by the applicable treaty; and 5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought. See Fernandez v. Phillips, 268 U.S. 311, 312 (1925); see also Foster v. Goldsoll, 48 App. D.C. 505, 517 (1919). Based on the following findings of fact, I conclude that those requirements are satisfied in this case.

## FINDINGS OF FACT[3]

---

[2] See 18 U.S.C. § 3142; Fed. R. Crim. P. 5.1; Ward, 921 F.2d at 287.

[3] The Court's findings are based on the following documents, which have been authenticated in accordance with 18 U.S.C. § 3190: 1) Diplomatic Note 04507 [from the Ambassador of Mexico to the Secretary of State], 2) Affidavit of Federal Public Prosecutor Jorge Joaquin Diaz Lopez, Attorney at Law With Appendices ("Aff."), 3) Appendix A: Arrest Warrant of De Zhenli Ye Gon ("Apdx. A"), 4) Appendix B: Substantive Law - Crimes and Penalties ("Apdx. B"), 5) Appendix C: Statutes of Limitations, 6) Appendix D: Evidence ("Apdx. D"), 7) Appendix E: Identification Information of Zhenli Ye Gon, 8) Haydee Chavez Sanchez Affidavit

1.      Ye Gon is a Chinese national with Mexican citizenship who owned and operated businesses in and around Mexico City, Mexico. Aff. ¶¶ 32-36; Apdx. D at D-1, D-2(a), D-2(b), D-3, D-4.

2.      Among those businesses was a pharmaceutical importing and brokering company named Unimed Pharm Chem ("Unimed"). Aff. ¶¶ 32-35; Apdx. D at D-2(a), D-2(b), D-3.

3.      From 2003 to July 2005, Unimed legally imported 33.875 tons of ephedrine, pseudoephedrine, and pseudoephedrine hydrochloride pursuant to a permit from COFEPRIS.[4] Aff. ¶ 37; Apdx. D at D-5(a), D-5(b).

4.      Ephedrine, pseudoephedrine, and pseudoephedrine hydrochloride are classified as psychotropic substances under Mexican health laws, and it is unlawful to import, transport, possess with intent to manufacture, or manufacture such psychotropic substances without a COFEPRIS permit. Apdx. B at 4-9; Apdx. D at D-49.

5.      On September 24, 2003, Ye Gon contracted with a Chinese company named Chifeng Arker Pharmaceutical Technology Co., Ltd. ("Chifeng Arker") to buy an "intermediate" chemical identified as "hydroxy benzyl-N-methylacetethamine"[5] which, according to the contract, was a precursor chemical that could be used to produce pseudoephedrine or pseudoephedrine hydrochloride. Aff. ¶¶ 37-40; Apdx. D at D-6(a).

_____

[#90-1], and 9) <u>Declaration of David O. Buchholz</u> ("Buchholz Decl.").

[4] COFEPRIS is the acronym, based on its initials in Spanish, for the Federal Commission Against Risks to Public Health. Aff. ¶ 16.

[5] The term "hydroxy benzyl-N-methylacetethamine" is an incomplete chemical designation that actually corresponds to "N-acetyl-pseudoephedrine," a psychotropic substance. May 14, 2010 Hearing Transcript ("5/14/10 Tr.") at 14-16, 58.

6.   Ye Gon and his senior chemist, Bernardo Mercado Jimenez ("Jimenez"), both signed the contract on behalf of Unimed. Apdx. D at D-6(a).

7.   According to the terms of the contract, Chifeng Arker agreed to sell and Unimed agreed to purchase a minimum of 50 tons of the chemical annually. Aff. ¶ 38; Apdx. D at D-6(a).

8.   The contract also called for Chifeng Arker to provide technical support to aid Unimed in the actual production of pseudoephedrine, to include "workshop housing design." Aff. ¶ 39; Apdx. D at D-6(a), D-6(b).

9.   The Mexican government never issued a permit to Unimed or Ye Gon to manufacture psychotropic substances such as pseudoephedrine. Aff. ¶ 35; Apdx. D at D-5(a).

10.  In 2003, when Ye Gon entered into this contract, Unimed was the fifth largest out of 19 importers of pseudoephedrine and ephedrine in Mexico; the next year, 2004, his company had more than doubled its pseudoephedrine and ephedrine imports, and had risen to third largest among 23 importers.  See Ye Gon Trial Exhibit 199 at 17.

11.  In 2004, the Mexican government determined that there was being imported into Mexico much more ephedrine and pseudoephedrine than was needed for lawful medical purposes and that, to prevent diversion of those substances for unlawful use, the amount permitted to be imported should be reduced. Aff. ¶¶ 43-44; Apdx. D at D-5(c).

12.  Consistent with this policy change, on July 1, 2005, the Mexican Secretary of Health, acting through COFEPRIS, eliminated Unimed and seven other companies as authorized importers of psychotropic substances, including ephedrine and pseudoephedrine. Aff. ¶

45; Apdx. D at D-9(a).[6]

13. Despite the loss of permission to import psychotropic substances in July 2005, and despite the fact that he had not been authorized to manufacture psychotropic substances, in October 2005, Ye Gon began to build and equip a manufacturing plant in Toluca, Mexico, with the help of Chinese advisors, as contemplated by the September 2003 contract with Chifeng Arker. Aff. ¶¶ 53, 55-60; Apdx. A ¶¶ 82, 137; Apdx. D at D-6(a), D-19, D-20.

14. Ye Gon also knowingly imported psychotropic substances from China without the required permits on at least four occasions between December 2005 and December 2006. Aff. ¶¶ 63, 66, 72, 75; Apdx. D at D-21(a), D-21(b), D-21(c), D-21(d), D-23(a), D-23(b), D-23(c), D-28(a), D-29(a), D-29(b), D-30(a), D-30(b), D-30( c), D-30(d), D-31(a), D-31(b), D-31( c), D-31(e).

15. On December 5, 2005, a shipment for Unimed arrived at the port of Manzanillo. Aff. ¶ 63.

16. Unimed officials, including Ye Gon and the senior company chemist, Jimenez, certified that the shipment contained 20,000 kilograms of a chemical described as "N-methly-acetilamino" from a Hong Kong company called Emerald Import & Export. Aff. ¶ 63; Apdx. D at D-21(a), D-21(b), D-21(c), D-21(d).

17. The shipment was stopped at customs, however, and the Mexican authorities took samples and ascertained that the certification was false; the substance was not

_____

[6] Unimed was permitted to sell what it had on hand as of July 2005. Aff. ¶ 45 n.4; Apdx. D at D-9(b), D-9(c).

"N-Methly-Acetilamino" but "N-Acetyl Pseudoephedrine." Aff. ¶ 65; Apdx. D at D-22.

18.    Under Mexican law, "N-acetyl pseudoephedrine" is a regulated psychotropic substance because it can be used to make pseudoephedrine hydrochloride, which is used for the clandestine formulation of amphetamines. Aff. ¶ 108; Apdx. B at 6-7; Apdx. D at D-22, D-24, D-29(a), D-29(b).

19.    The substance "N-methly-acetilamino" is not a recognized chemical substance, but an incomplete name that corresponds to "N-acetyl-pseudoephedrine." 5/14/10 Tr. at 14-15.

20.    Chinese authorities indicated that there is no company by the name of Emerald Import & Export registered in Hong Kong. Aff. ¶ 108; Apdx. D at D-38.

21.    Ye Gon falsely represented under oath to Mexican customs authorities that Emerald Import & Export was a supplier based in Hong Kong. Apdx. D at D-21(d).

22.    On January 3, 2006, another shipment of approximately 29,400 kilograms arrived in Manzanillo for Unimed from Emerald Import & Export. Aff. ¶ 66.

23.    The contents were described as "N-methly-acetilamino" in a document certified by Jimenez, although a chemical analysis by Mexican customs authorities indicated that the substance was in fact the same psychotropic substance as the one in the December 2005 shipment. Aff. ¶¶ 66, 68; Apdx. D at D-23(a), D-23(b), D-23(c), D-24.

24.    On July 3, 2006, a shipment of a substance that Jimenez certified to be "Hydroxy Benzyl-N-Methyl Acetethamine" arrived from Hong Kong, again sent by Emerald Import & Export. Aff. ¶¶ 72-73; Apdx. D at D-28(a), D-28(b), D-28(c), D-28(d).

25.    "Hydroxy benzyl-N-methyl acetethamine" is the name of the intermediate chemical that Ye Gon contracted to buy from Chifeng Arker in September 2003 to use to produce

pseudoephedrine and pseudoephedrine hydrochloride. Aff. ¶ 38; Apdx. D at D-6(a).

26. Tests of samples from the July 3, 2006 shipment revealed that the substance was again actually "N-acetyl-pseudoephedrine" and not "hydroxy benzyl-N-methyl acetethamine." Aff. ¶¶ 75, 108; Apdx. D at D-29(a), D-29(b).

27. After samples were obtained from the December 2005 and January 2006 shipments, both shipments were released to a cargo company hired by Ye Gon to transport the shipments to the Unimed warehouse in Mexico City. Aff. ¶¶ 63, 66, 71.

28. Similarly, after samples were obtained from the July 2006 shipment, the shipment was released for transportation by a cargo company to Ye Gon's manufacturing plant in Toluca. Aff. ¶¶ 64, 66, 71-75; Apdx. A ¶¶ 59, 66; Apdx. D at D-26; D-27, D-28(a), D-31(e).

29. In November 2006, Mexican authorities intercepted yet another shipment to Unimed, again purportedly from Emerald Import & Export Co. Aff. ¶¶ 120-122.

30. The shipment, which was intended for delivery to the Toluca plant, was detained and samples of its contents were taken. Aff. ¶¶ 120-122; Apdx. A ¶¶ 59, 62, 66; Apdx. D at D-25(b), D-26, D-27, D-40(a), D-40(b), D-41(a).

31. Expert analysis determined that its contents, which were certified by Jimenez to contain 19,797 kilograms of "hydroxy benzyl N-methyl acetethamine," were instead a chemical mixture containing ephedrine acetate. Aff. ¶¶ 122-123; Apdx. D at D-40(c), D-41(b).

32. Under Mexican law, ephedrine acetate is a psychotropic substance. Aff. ¶ 123; Apdx. B at 6-7; Apdx. D at D-41(b).

33. In a statement dated July 2007, Ye Gon said that this fourth shipment, which was seized

by Mexican authorities, was from Chifeng Arker, pursuant to Unimed's contract with Chifeng Arker. <u>Respondent's Request for Hearing and Opposition to Government's Request for Certificate of Extraditability</u> [#112], Exhibit 1 at 3.

34.   The Tuluca plant was operational by April 2006. Aff. ¶ 61.

35.   According to a plant worker, the plant received daily shipments of a white hard chemical substance that was then heated with hydrochloric acid to form a white crystalline powder. Aff. ¶¶ 61, 83-84; Apdx. A ¶¶ 215, 286; Apdx. D at D-16, D-32.

36.   According to Mexican chemical experts, "N-acetyl-pseudoephedrine," which Ye Gon had been secretly importing and transporting to the Unimed warehouse or directly to the Toluca plant, can be converted to pseudoephedrine hydrochloride by treating it with heated hydrochloric acid. Aff. ¶ 65; Apdx. D at D-22.

37.   Certain machinery used in that process, and certain areas of the plant, were off limits for many plant personnel. Aff. ¶ 79; Apdx. A ¶ 286; Apdx. D at D-32.

38.   That equipment and those areas seemed to be handled exclusively by Jimenez and one or two Chinese consultants. Aff. ¶ 79; Apdx. A ¶ 286; Apdx. D at D-32.

39.   In March 2007, Mexican authorities searched the Toluca plant, taking samples from the machines, tanks, barrels, and bags that had been described by plant workers as the place where they produced over 600 kilograms daily of a "white crystalline powder." Aff. ¶ 138; Apdx. D at D-48.

40.   In the analyzed samples, Mexican chemical experts identified the presence of ephedrine, pseudoephedrine and ephedrine acetate, as well as methamphetamine acetate, which Mexican law classifies as psychotropic substances. Aff. ¶ 138; Apdx. D at D-48.

41. Under Mexican law, the first three substances are considered to be essential chemical precursors of methamphetamine. Aff. ¶ 138; Apdx. D at D-48.

42. The machinery at the Toluca plant was appropriate for the manufacture of psychotropic substances, such as pseudoephedrine, ephedrine, and ephedrine acetate. Apdx. D at D-49.

43. Ye Gon did not have a permit to produce psychotropic substances in Mexico. Aff. ¶¶ 35, 98; Apdx. A ¶ 274; Apdx. D at D-5(a), D-15.

44. In addition, traces of sulfuric acid were found in the Toluca plant. Aff. ¶ 138; Apdx. D at D-48, p. 6, Sample 40.

45. Because sulfuric acid is classified as an "essential chemical product" by Mexican law, its diversion for the unlawful production of psychotropic substances is a criminal violation of Mexican health laws. Aff. ¶ 138; Apdx. B at 9; Apdx. D at D-48.

46. According to workers at the Toluca plant, the white crystalline powder produced at the plant was bagged and driven away by Ye Gon or his personal driver at the end of the work day. Aff. ¶¶ 81, 85; Apdx. A ¶¶ 215, 286; Apdx. D at D-16; D-32.

47. During the same period of time, the driver was seen arriving at the warehouse and office of Unimed in Mexico City in the evening, where he disabled security cameras. Aff. ¶ 87; Apdx. A ¶ 207; Apdx. D at D-12.

48. In a March 2007 search of Unimed offices in Mexico City, Mexican authorities discovered a dozen plastic bags of a pseudoephedrine hydrochloride in Ye Gon's office, ten months after the company was supposed to have sold off all legally acquired inventory of that psychotropic substance. Aff. ¶¶ 45 n.4, 137; Apdx. D at D-5(c), D-9(b), D-47(a), D-47(c).

49. Despite producing and transporting away approximately 600 kilograms per day of a "final product" from the Toluca plant, Ye Gon reported no income for that plant, or Unimed. Aff. ¶ 102; Apdx. D at D-4, D-17(a).

50. A former Unimed sales manager told authorities that, although something was being produced at the Toluca plant in May and June 2006, nothing new was being recorded in company inventory. Aff. ¶ 86; Apdx. A ¶ 207; Apdx. D at D-12.

51. Similarly, according to a former accountant for Unimed, the company did not keep accurate records of known sales of chemical products from Toluca, and she was unable to get complete information about sales or deposits from Ye Gon's close associates so that she could satisfy various accounting requirements. Aff. ¶¶ 99-100; Apdx. D at D-14.

52. Former Unimed employees stated that business at the Toluca plant was conducted in U.S. dollars and Mexican currency, suppliers were paid in U.S. dollars, and envelopes of cash from apparent sales were received and delivered directly to Ye Gon. Aff. ¶ 101; Apdx. A ¶¶ 207, 260; Apdx. D at D-12, D-14.

53. Employees also were paid in cash. Aff. ¶ 101; Apdx. A ¶ 207; Apdx. D at D-12, D-33.

54. At the same time as he was unlawfully producing psychotropic chemicals at the Toluca plant, Ye Gon accumulated hundreds of millions in U.S. currency, as well as currency from other countries. Aff. ¶¶ 131, 134; Apdx. D at D-45(a).

55. In a March 2007 search of Ye Gon's home in Mexico City, Mexican authorities found, in a concealed, locked room off Ye Gon's master bedroom, the following amounts, in cash: 1) 205,564,763 U.S. Dollars; 2) 201,460 Euros; 3) 17,306,520 Pesos; 4) 113,260 Hong Kong Dollars; and 5) 180 Canadian Dollars. Aff. ¶¶ 131, 134; Apdx. D at D-45(a).

56.     During the same time period, Ye Gon arranged to move hundreds of thousands of U.S. dollars, Euros, and Mexican pesos through Mexican money exchanges ("casas de cambio") to bank accounts outside Mexico. Aff. ¶¶ 103-105; Apdx. A ¶ 229; Apdx. D at D-34(a), D-35(a).

57.     In addition, the U.S. Drug Enforcement Agency reported that records from American casinos in Las Vegas, Nevada showed that between 2004 and 2007, Ye Gon paid over $125,000,000 to those casinos. Aff. ¶ 106; Apdx. D at D-36.

58.     He was also maintaining at least two homes, one in Mexico City and one in China, and living a lavish lifestyle. Aff. ¶ 135.

59.     Ye Gon concealed the source and purpose of his money transfers from representatives of the money exchanges. Aff. ¶¶ 102-104; Apdx. A ¶ 229; Apdx. D at D-34(a), D-35(a).

60.     He told one money exchange, which he used to exchange or transfer hundreds of thousands of U.S. dollars per week, that the source of the money was a company dedicated to producing raw materials used in making veterinary medicines and that the money was being used to pay his suppliers for that business in U.S. dollars. Aff. ¶¶ 102-104; Apdx. A ¶ 229; Apdx. D at D-34(a), D-35(a).

61.     Records show that much of the money moved through the money exchanges was actually being used to pay for materials and supplies for the unlawful Toluca plant. Aff. ¶¶ 102-104; Apdx. A ¶ 229; Apdx. D at D-34(a), D-35(a).

62.     Some payments also corresponded to scheduled payments for the intermediate chemical that Ye Gon had contracted to purchase from Chifeng Arker in 2003, that was to be used to produce pseudoephedrine. Aff. ¶¶ 38, 107; Apdx. D at D-6(a), D-28(b), D-30(b), D-

31(b), D-35(b).

63.    One money exchange transferred three payments totaling approximately $2 million to Chifeng Arker on dates corresponding to the times that Unimed purportedly received, from Emerald Imports & Exports, shipments of "hydroxy benzyl-N-methyl acetethamine," the intermediate substance named in the contract with Chifeng Arker. Aff. ¶¶ 38, 107; Apdx. D at D-6(a), D-28(b), D-30(b), D-31(b), D-35(b).

64.    At least one of those shipments, in July 2006, was sampled and shown to be N-acetyl pseudoephedrine. Aff. ¶ 75; Apdx. D at D-29(a).

65.    Ye Gon engaged in his unlawful importation and manufacturing businesses with the knowing assistance of a "trusted team"[7] of associates, including the following individuals:

    a.    <u>Bernardo Mercado Jimenez</u> was a registered chemist who worked for Unimed. Aff. ¶ 40. Ye Gon and Jimenez signed the pseudoephedrine-production contract between Unimed and Chifeng Arker. Aff. ¶ 40; Apdx. D at D-6(a). Jimenez also falsely certified the chemical identities of the controlled substances illegally imported by Unimed. Aff. ¶¶ 63, 66, 73, 122; Apdx. D at D-21(c), D-23(c), D-28(c), D-40(c). He was aware that the permits to import psychotropic substances had been withdrawn. Aff. ¶ 45, 45 n.4; Apdx. A ¶ 268; Apdx. D at D-13. Jimenez was one of Ye Gon's trusted associates, and had access to otherwise restricted areas of the Toluca plant. Aff. ¶ 79; Apdx. A ¶ 286; Apdx. D at D-32.

    b.    <u>Maria Eugenia Mayorga Cano</u> is Ye Gon's sister-in-law, and was in charge of

---

[7] Aff. ¶ 48.

credit and collections for Unimed. Aff. ¶ 48.  Cano falsely certified illegal shipments of controlled substances. Aff. ¶¶ 73, 122; Apdx. D at  D-28(d), D-40(c); contracted with a currency exchange house in early 2006 on behalf of Ye Gon's companies, and, in just one transfer, personally deposited almost one million U.S. dollars in cash into that account, Aff. ¶ 103; Apdx. A ¶ 229; Apdx. D at D-34(a); and was trusted by Ye Gon to manage his businesses while he traveled to China in July 2005, Aff. ¶ 52; Apdx. A ¶¶ 268, 274; Apdx. D at D-5(d), D-13, D-15.

c. <u>Susana Gomez</u> was an engineer for Unimed and a confidante of Ye Gon's. Apdx. A ¶ 166.  When the seizure of the November 2006 shipment became public, Gomez gathered company documents concerning the shipment and took them to Ye Gon, after which employees were told that the shipment did not belong to the company. Aff. ¶ 125; Apdx. A ¶ 166; Apdx. D at D-39.  When a company lawyer suggested going to investigate the charge that the November 2006 shipment was illegal, Gomez threatened him, saying, "You're a real fool, or you have a lot of money to fix this matter, because I have already fixed it with the lawyers, and if you want to keep your life and liberty, keep behind the line." Aff. ¶ 127; Apdx. A ¶ 166; Apdx. D at D-39.

d. <u>Jose Obed Olvera Salguero</u> was Ye Gon's personal driver. Aff. ¶ 85.  At the end of each work day, Salguero would drive to the Toluca plant and pick up the 600 kilograms of a white crystallized substance produced that day. Aff. ¶ 85; Apdx. A ¶ 215; Apdx. D at D-16.  He was seen later on at least two occasions arriving at

the Unimed warehouse in Mexico City, long after work hours, and disabling

security cameras, in order to conceal his illicit activities. Aff. ¶ 87; Apdx. A ¶207;

Apdx. D at D-12.

66. Ye Gon was the sole administrator of the companies that he used for his illegal activities. Aff. ¶¶ 34, 36, 53; Apdx. D at D-3, D-4, D-17.

67. He closely managed every aspect of these companies, including personally interviewing the candidates for jobs before hiring them, Aff. ¶¶ 50-51, 77-78; Apdx. A ¶¶ 207, 268, 260, 215, 286; Apdx. D at D-12, D-13, D-14, D-16, D-32, and firing employees whom he perceived as a threat to his illegal operation, Aff. ¶¶ 108-119; Apdx. A ¶¶ 207, 268, 215, 286; Apdx. D at D-12, D-13, D-16, D-32.

68. Ye Gon did not tell those employees not on his "trusted team" what they were really doing in the plant. Aff. ¶¶ 94-100, 111; Apdx. A ¶¶ 268, 274, 215, 82, 286; Apdx. D at D-13, D-15, D-16, D-20, D-32.

69. When he was out of the country, Ye Gon maintained control over his businesses, relaying instructions in frequent telephone calls to employees such as Cano. Aff. ¶¶ 52, 118, 126; Apdx. A ¶¶ 268, 274; Apdx. D at D-13, D-15.

70. The Mexican charges for which extradition is sought are:

    1. Participation in organized crime, for the purpose of repeatedly committing drug crimes and operations with illegal funds, in violation of Mexican law;

    2. Drug-related offenses in the forms of:

        a. importation into Mexico of psychotropic substances;

        b. transportation of psychotropic substances;

      c.      manufacture of psychotropic substances;

      d.      possession of psychotropic substances for the purpose of

              producing narcotics; and

      e.      diversion of essential chemical products, namely sulfuric

              acid, to produce narcotics;

3.      Violations of the federal law on firearms and explosives in the form of possession

      of firearms reserved for the exclusive use of the Army, Navy and Air Force; and

4.      Money laundering, by himself or through an intermediary, by having

      custody of funds within Mexico, knowing that the funds have their source

      in an illegal activity, with the intention to impede knowledge of their

      source, location, destination, or ownership.

Aff. ¶ 19; Apdx. A at 635-40.

## CONCLUSIONS OF LAW

I.    <u>The Court Has Jurisdiction Over the Respondent</u>

Pursuant to federal statute, a judicial officer "may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue [its extradition] warrant for the apprehension of the person so charged." 18 U.S.C. § 3184; <u>see also</u> <u>Pettit v. Walshe</u>, 194 U.S. 205, 219 (1904). At the time the extradition complaint was filed in this case, Ye Gon was being held in custody in the District of Columbia pursuant to a detention order issued by this Court on August 6, 2007, in a criminal case. <u>See</u> <u>Detention Memorandum</u> [#6] (No. 07-CR-181-EGS). Although the respondent was originally arrested in Maryland on the warrant issued in that case, the respondent was properly brought to the District to face those criminal charges, which were

based on an indictment returned by a grand jury in this District.  Therefore, despite the respondent's contention that he was never "found" in the District of Columbia, he was unquestionably lawfully being held in the District of Columbia at the time the Mexican arrest warrant and request for extradition was filed.  Surely that interpretation of the events comports with 1) the natural and traditional meaning of the word "found" in 18 U.S.C. § 3184 and 2) the traditional principle that the exercise of jurisdiction over a person who is in the territorial jurisdiction of the court satisfies due process. Burnham v. Sup. Ct. of California, 495 U.S. 604, 610 (1990); Pennoyer v. Neff, 95 U.S. 714, 733 (18 77).  As a result, this Court has jurisdiction to conduct extradition proceedings against him.

II.      The Treaty Under Which Extradition Is Sought Is In Full Force and Effect

Extradition is authorized when there is an extradition treaty between the country requesting extradition and the United States. 18 U.S.C. § 3184.  According to the declaration of David O. Buchholz, Attorney Adviser in the Office of the Legal Adviser for the Department of State, the extradition treaty between the United States and Mexico is in full force and effect.  See Buchholz Decl. ¶3; Treaty.  The Department of State's determination as to the validity of a treaty is entitled to deference, see Kastnerova v. United States, 365 F.3d 980, 985-87 (11th Cir. 2004), as is their determination as to extraditions generally, see Casey v. Dep't of State, 980 F.2d 1472, 1478 (D.C. Cir. 1992).

III.     The Criminal Acts For Which Extradition Is Sought Constitute "Extraditable Offenses" Under the Treaty

The extradition treaty between the United States and Mexico authorizes the return of individuals charged with or convicted of an "extraditable offense." Treaty, art. 1.  Extraditable

offenses are defined as "wilful acts which fall within any of the clauses of the Appendix and are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year." Id.

As certified by the Department of State, the wilful acts that underlie the offenses for which extradition is sought come within the Treaty's list of extraditable offenses. See Buchholz Decl. ¶ 5; Treaty, art. 2; Treaty, appdx. ¶¶ 12, 14, 15, 19, 21, 22. The State Department also certified that the acts on which the Mexican charges are based are "punishable in accordance with the laws of both contracting parties by deprivation of liberty for a period of at least one year," as also required by Article 2 of the Treaty. See Buchholz Decl. ¶ 5; Treaty, art. 2. As noted above, the State Department's determination is entitled to deference. See Factor v. Laubenheimer, 290 U.S. 276, 293-94 (1933). In this case, the Court finds that the State Department's determinations are sound.

Article 2 of the Treaty permits the extradition of a person who has wilfully committed acts, punishable by more than one year, "in accordance with the laws of both Contracting Parties." Treaty, art. 2(1). It is clear that this does not oblige either sovereign to establish that their laws are identical. In other words, under this section of the Treaty, a Blockburger[8] comparison of the elements of the requesting and requested states' charges is not appropriate. In Collins v. Loisel, 259 U.S. 309 (1922), the petitioner argued that British law, then applicable in India, punished the crime of cheating while the law of Louisiana had no such offense but instead punished, in traditional common law fashion, the crime of taking property by false pretenses. First, the Supreme Court noted that English law defined the offense by condemning "[w]hoever

_____

[8] Blockburger v. United States, 284 U.S. 299 (1932).

cheats and thereby dishonestly induces the person de ceived [sic] to deliver any property to any

person" while Louisiana law condemned "[w]hoever, by any false pretense, shall obtain, or aid

and assist another in obtaining from any person, money or any property with intent to defraud

him of the same." Id. at 311-12 (internal quotations and citations omitted). Nevertheless, the

Court, per Justice Brandeis, indicated that one looked at the crimes actually charged and at the

facts underlying those charges to ascertain whether the crime charged by the demanding state was

also a crime in the requested state. Id. at 312. In other words, the treaty term that defined what is

now known as "dual criminality" was to be construed not on the basis of the elements of the

crime but on whether the conduct charged was a crime in both jurisdictions:

> The law does not require that the name by which the crime is
> described in the two countries shall be the same; nor that the scope
> of the liability shall be coextensive, or, in other respects, the same
> in the two countries. It is enough if the particular act charged is
> criminal in both jurisdictions.

Id. at 312.

In United States v. Sensi, 879 F.2d 888 (D.C. Cir. 1989), the court of appeals for this

Circuit was confronted with the argument that the defendant's extradition was invalid because a

British magistrate had not specifically found that the defendant had committed mail fraud, the

charge he was indicted on in the United States pursuant to 18 U.S.C. § 1341. Under British law,

the prosecution must establish that the defendant succeeded in taking something from someone,

while under the law of the United States, one can violate the mail fraud statute without actually

stealing anything. Id. at 893. According to Sensi, this meant that had he committed the United

States crime of mail fraud, "he would not *necessarily* have been committed for trial for theft

under United Kingdom law." Id. That, according to the court, would have led to the conclusion

that "mail fraud is *never* an extraditable offense . . . an absurd result, given that the criminal laws of two countries are rarely an exact match." Id. Instead, the court's analysis properly began with the realization that Sensi was accused of stealing from his employer; use of the mails was merely a means of committing it and both countries, of course, punished theft: "The fact that a hypothetical person could be convicted of mail fraud in the United States *absent a theft* is irrelevant to this case, in which the "offense" *was* theft." Id. at 893-94. The court then approvingly quoted the Restatement (Third) of Foreign Relations Law of the United States § 476 for its emphasis on "the acts of the defendant, and not on the legal doctrines of the country requesting extradition." Id. Thus, as indicated in the Restatement, and as held by the Supreme Court in Collins, the focus must be on the defendant's acts, rather than on the legal doctrines or specific requirements of proof in the two jurisdictions. Id. In that case, since the act charged, theft, was a crime in England as it was in America, the dual criminality requirement of the extradition treaty was satisfied. Id.

The holding in Sensi is consistent with that of other federal courts although the manner in which they phrase the test may differ. See, e.g., Clarey v. Gregg, 138 F.3d 764, 766 (9th Cir. 1998) (sufficient if "'the laws of the both the requesting and the requested party appear to be directed to the same basic evil.'") (internal quotation omitted). Indeed, exhaustive research discloses precious few cases in which a federal court held there was not dual criminality. E.g., United States v. Khan, 993 F.2d 1368, 1372-73 (9th Cir. 1993) (dual criminality not satisfied because there was nothing in Pakistani law that was sufficiently analagous to 21 U.S.C. § 843, which criminalizes the use of a telephone to perpetrate a drug felony). In all other instances, the federal courts have examined the acts charged and found dual criminality when they have found

that the acts as charged in the demanding state's papers would be also be a crime in the requested state because, putting aside the titles and specific elements of the acts, the laws of both states would punish them. E.g., Kelly v. Griffin, 241 U.S. 6, 14 (1916) (dual criminality satisfied although Canada did not require that perjured statements be material and American law did); Manta v. Chertoff, 518 F.3d 1134, 1141 (9th Cir. 2008) (irrelevant that elements of crime, scope of liability and name of crime are not identical; that the statutes are "substantially analogous" suffices) (internal quotations and citations omitted); De Silva v. DiLeonardi, 125 F.3d 1110, 1114 (7th Cir. 1997); Spatola v. United States, 925 F.2d 615, 619 (2d Cir. 1991) (laundering proceeds of narcotics transactions and conspiring to export narcotics "falls within the proscriptions of United States law prohibiting money laundering, 18 U.S.C. § 1956, and prohibiting aiding and abetting or conspiring to engage in narcotics trafficking, 21 U.S.C. §§ 841(a)(1), 846, 953, 963."); United States v. Levy, 905 F.2d 326, 328-29 (10th Cir. 1990), cert. denied, 498 U.S. 1049 (1991) (accused leader of cocaine trafficking operation deemed extraditable even though elements of America crime of operating continuing criminal enterprise had no equivalent in Hong Kong law); In re Manzi, 888 F.2d 204, 208 (1st Cir. 1989) (elements of two crimes need not be identical; Italian charge of acquiring or receiving car "*knowing of its unlawful provenance*" would be receiving stolen property under Massachusetts law) (internal quotation and citation omitted); Matter of Extradition of Russell, 789 F.2d 801, 803-04 (9th Cir. 1986) ("each element of the offense purportedly committed in a foreign country need not be identical to the elements of the similar offense in the United States.").

Certainly, as will be established in more detail below, the Mexican offenses charged against the respondent are, to put it mildly, analogous to similar provisions in American law and

both strike at the same evils. The Mexican government charges that the respondent and his confederates conspired to illegally import various chemicals into Mexico to create substances that are themselves illegal and then possessed large quantities of these substances, even though that very possession was illegal. Mexico also charges that the respondent impeded the authorities from ascertaining the true source of the proceeds from these activities and that he illegally possessed various firearms. Viewed as a whole, the Mexican indictment reads like those filed on a daily basis in United States federal and state courts. This case is nothing like <u>Khan</u>, where the court concluded that there was nothing whatsoever in Pakistani law equivalent or analogous to the American crime of using a phone to perpetrate a drug felony. Instead, it is exactly like all of those cases in which federal courts have readily concluded that, elements and names to one side, the laws of the two countries punished similar, equivalent, or analogous acts. Surely, no one familiar with the federal criminal code would dare say that Mexican laws outlawing the acts of illegally importing chemicals used to make psychotropic drugs and then disguising the proceeds realized from that manufacture and protecting them with illegal firearms in an illegal drug lab have no analogues in the federal code, or do not strike at the same evils as the federal statutes that deal with the precise same acts.

It is in this sense that respondent's testimonial evidence from a chemist misses the mark. The respondent offered the testimony of Dr. Thomas Lectka, a professor of chemistry at Johns Hopkins University in Baltimore, Maryland, as an expert in the fields of synthetic and physical organic chemistry. 5/14/10 Tr. at 9, 12.

First, Dr. Lectka testified that the first of the four shipments imported by the respondent in this case were designated as containing "N-acetyl pseudophedrine." <u>Id.</u> at 13. He further

testified that this designation was not a complete chemical name. Id. at 15.  More specifically, he testified that while it was not an inaccurate designation, "it represents only part of the molecular structure of this substance." Id.  Dr. Lectka's testimony was the same as to the substances contained in the remaining three shipments. Id. at 15-17.  Second, Dr. Lectka testified that, according to the United States Code of Federal Regulations, the substance in the first three shipments, identified as "N-acetyl pseudoephedrine," is not a controlled substance or List 1 chemical under U.S. law. Id. at  20-22, 23.  Third, Dr. Lectka testified that the fourth shipment contained two substances identified as ephedrine acetate and N-2-acetyloxy-1-methyl-2-phenylethyl-N-methyl. Id. at 25.  According to Dr. Lectka, while the first substance is considered a controlled substance under Mexican law, the chemical designation "ephedrine acetate" was simply too ambiguous to be conclusive: "I think the name [ephedrine acetate] could represent more than one chemical structure that could be reasonably described as ephedrine acetate that would be different than the chemical structure right here." Id. at 28.  Fourth, Dr. Lectka testified that in all likelihood, the chemical substance that was found at the Toluca plant was the result of a botched chemical process or a "bad batch," something that was "a very common occurrence in organic chemistry." Id. at 31, 36.  Fifth, Dr. Lectka testified that DEA testing of chemicals found in the Toluca plant revealed that they were not the type of chemicals typically used in the production of methamphetamine. Id. at 48.  Finally, Dr. Lectka testified that it was common for pharmaceutical companies to keep sample batches of their final products. Id. at 50-51.

That on a given day the substances found in the lab by Mexican authorities were, as claimed by the respondent, not substances prohibited by Mexican law, goes to whether or not he is guilty of the crimes charged.  It has nothing whatsoever to do with the legal question of

whether the Mexican charges have substantial equivalents in American law.  Conspiring to evade

legal restrictions on the importation of certain chemicals, manufacturing illegal psychotropic

substances, laundering the proceeds of the sale of those substances and possessing illegal

firearms most assuredly do.

Finally, as the government has correctly pointed out on several occasions, Mexico relies

on evidence showing that the respondent was importing N-acetyl pseudoephedrine chemicals and

ephedrine acetate in order to manufacture drugs that are controlled by United States law, i.e.,

pseudoephedrine hydrochloride, and other pseudoephedrine and ephedrine substances.

Government's Legal Memorandum in Support of Second Proposed Findings of Fact and

Conclusions of Law [#157] at 4; Memorandum In Support of Extradition [#6] at 44-45;

Memorandum In Opposition to Ye Gon's Preliminary "Explanation" and Motion to Vacate Order

of Arrest [#11] at 16.  Since pseudoephedrine and ephedrine and their salts, optical isomers, and

salts of optical isomers are controlled substances under American law,[9] importation and

transportation of any chemical for that purpose would also be a felony under American law. 21

U.S.C. § 843(a)(7).  The United States and Mexico therefore both have laws that prohibit the

unauthorized importation of chemicals that can be converted into methamphetamine precursors,

such as pseudoephedrine, and ultimately methamphetamine itself.

I will now engage in a more detailed analysis of why the specific offenses charged by

Mexico have substantial equivalents in American law.

A.     Organized Crime

First, Mexico alleges that Ye Gon acted in concert with at least three other persons for the

---

[9] See 21 U.S.C. § 802(34)(c) and (K); 21 C.F.R. §§ 1310.02(a)(3) and (a)(11).

purpose of repeatedly violating Mexican laws concerning narcotics and controlled psychotropic substances and/or money laundering.  Such collaborative conduct is analogous to conduct punishable as a felony under the federal laws of the United States, such as those prohibiting criminal conspiracies generally, <u>see</u> 18 U.S.C. §371; conspiracies to violate drug laws, <u>see</u> 21 U.S.C. § 846; money-laundering conspiracies, <u>see</u> 18 U.S.C. § 1956(h); and continuing criminal enterprises to violate drug laws, <u>see</u> 21 U.S.C. §848.

The evidence shows that Ye Gon worked closely with four other individuals: 1) Jimenez, 2) Cano, 3) Gomez, and 4) Salguero.  The Court therefore finds probable cause to believe that not only did Ye Gon act in concert with these individuals to violate Mexican drug and money laundering laws, but that he directed the activities of this criminal conspiracy.

B.     <u>Drug Offenses</u>

Second, Mexico alleges that Ye Gon unlawfully 1) imported and transported the regulated (under Mexican law) psychotropic substances N-acetyl-pseudoephedrine and ephedrine acetate; 2) possessed and/or manufactured the regulated psychotropic substances pseudoephedrine, ephedrine, pseudoephedrine hydrochloride, and methamphetamine hydrochloride; and 3) diverted the "essential chemical" sulfuric acid, in order to produce narcotics such as N-acetyl-pseudoephedrine acetate, ephedrine acetate, ephedrine, pseudoephedrine, and methamphetamine.

As explained above, each of these kinds of criminal conduct would be punishable as a felony under 21 U.S.C. §§ 843(a)(6) and (a)(7), which together make it a crime to possess, manufacture, distribute, or import "*any . . . chemical*, product, or material which may be used to manufacture a controlled substance or listed chemical, knowing, intending, or having reasonable cause to believe, that it will be used to manufacture a controlled substance or listed chemical"

(emphasis added). Pseudoephedrine and ephedrine, and their salts, optical isomers, and salts of optical isomers, are "listed chemicals" for purposes of Section 843. See 21 C.F.R. §§ 1310.02(a)(3) and (a)(11). Pseudoephedrine hydrochloride is a salt of pseudoephedrine.

In addition, both Mexico and the United States have enacted laws to prohibit the unauthorized importation, distribution and manufacture of chemicals that can be readily converted to dangerous drugs such as methamphetamine. In other words, both countries' laws are directed to "the same basic evil." See Clarey, 138 F.3d at 766 (internal quotation marks and citations omitted). Thus, while the two countries' laws may not regulate exactly the same chemicals, the underlying criminal conduct being targeted is the same, and therefore the requisite dual criminality is present.[10]

The evidence shows that Ye Gon and his senior chemist, Jimenez, knowingly entered into a contract to purchase and import a psychotropic chemical for the purpose of manufacturing pseudoephedrine and ephedrine. When they lost the ability to import such chemicals lawfully, they nonetheless continued to import them surreptitiously using a misleading chemical name and a false supplier. Ye Gon himself admitted that the fourth shipment, which Unimed had certified as coming from Emerald Imports, came instead from Chifeng Arker in conformity with the contract to import pseudoephedrine precursors. The Court therefore finds probable cause to support the drug importation and transportation charges.

_____

[10] Although Ye Gon contends that N-Acetyl-pseudoephedrine and the form of ephedrine acetate imported by him are not controlled substances and are not listed chemicals under United States law, and that therefore, their importation and transportation would not be unlawful in the United States, because federal law prohibits the possession, manufacture, distribution, and importation of "any . . . chemical" which may be used to manufacture a "listed chemical" such as pseudoephedrine, pseudoephedrine hydrochloride, or ephedrine, his argument is without merit.

C.     Money Laundering

Third, Mexico alleges that Ye Gon knowingly possessed funds derived from illegal activity, that is, unlawful importation, transportation, possession, and manufacture of controlled psychotropic substances, with the intent to obscure the source, location, destination, or ownership of those funds.  Under U.S. law, 18 U.S.C. § 1956(a)(1), it is a felony offense to conduct a financial transaction, knowing that the property involved represents the proceeds of an unlawful act, which in fact involves the proceeds of the specified unlawful act, while, *inter alia*, 1) having the intent to promote the carrying out of the specified unlawful activity, or 2) with the knowledge that the transaction was designed to disguise the nature, location, source, ownership, or control of the proceeds.

The evidence shows that Ye Gon engaged in money laundering of proceeds from his illegal drug activity, in part by hiding millions of dollars in a closet, and in part by funneling cash proceeds through Mexican money exchanges in order to pay suppliers of equipment and raw materials for his unlawful chemical manufacturing plant in Toluca, Mexico.  This accumulation of unexplained wealth at the same time that Ye Gon was engaged in illegal drug importation and manufacturing; his surreptitious handling of receipts and payments involving the illegal Toluca plant; plus his use of Mexican money exchanges to disguise payments to Chifeng Arker, establish probable cause to believe that Ye Gon engaged in money laundering as charged.

The Court notes further that this finding of dual criminality is no less valid even though the Mexican money laundering statute does not require a financial transaction, while the U.S. statute does.  Ultimately, as established above, such a conclusion is not based on a review of the elements of the offense.  Rather, as stated by the court in Russell, 789 F.2d at 803, "to satisfy the

'dual criminality' requirement, each element of the offense purportedly committed in a foreign country need not be identical to the elements of a similar offense in the United States." Rather, as noted above, "the central focus is on the defendant's *acts*." <u>Sensi</u>, 879 F.2d at 894 (emphasis added). In this case, the money laundering statutes of both the United States and Mexico are addressed to the same evil; that is, the ability of criminals to profit from their wrongdoing and to use proceeds to further their criminal activities. That the U.S. statute adds the element of a financial transaction does not change this shared purpose. In any event, Ye Gon's acts did involve various "financial transactions."

Under the U.S. money-laundering statute, financial transactions include the purchase, sale, loan, pledge, gift, transfer, delivery or other disposition of property between parties. <u>See</u> 18 U.S.C. § 1956(c)(3). With respect to financial institutions, these transactions include deposits, withdrawals, transfers between accounts, exchanges of currency, loans, extensions of credit, use of a safe deposit box, or any other payments, transfers, or deliveries by, through, or to a financial institution. <u>Id.</u> In this case, qualifying financial transactions would include the following: 1) Ye Gon's use of his illegal proceeds to pay off gambling debts,[11] 2) Ye Gon's use of other Unimed employees, such as Cano, to transfer hundreds of thousands of U.S. dollars to the casas de cambio,[12] and 3) Ye Gon's own use of casas de cambio to transfer money to pay for equipment and supplies at the Toluca plant, and to pay Chifeng Arker for the chemicals used in the illegal manufacture of pseudoephedrine hydrochloride.

    D.    <u>Unlawful Possession Of Firearms</u>

---

[11] <u>See</u> <u>United States v. Iacaboni</u>, 363 F.3d 1, 4 (1st Cir. 2004).

[12] <u>See</u> <u>United States v. Short</u>, 181 F.3d 620, 626 (5th Cir. 1999).

27

Finally, Mexico alleges that Ye Gon's conduct violated two separate provisions of the laws prohibiting unlawful possession of firearms reserved for the use of the military. Those charges were based on the discovery of firearms in two locations. First, firearms were seized from a locked, hidden room off the master bedroom in Ye Gon's home, where Ye Gon also stashed millions of U.S. dollars and other currency. There, Mexican authorities seized an AK-47 assault rifle, two 9mm semi-automatic pistols, and a .45-caliber pistol. Second, firearms were seized from Ye Gon's private office in Mexico City, where Mexican authorities also found 12 bags of unauthorized pseudoephedrine hydrochloride as well as a 9mm pistol.

Where, as here, the Treaty defines extraditable offenses in terms of the "laws of both Contracting Parties,"[13] dual criminality may be determined according to "similar criminal provisions of federal law or, if none, the law of the place where the fugitive is found." Cucuzzella v. Keliikoa, 638 F.2d 105, 107 (9th Cir. 1981) (internal citations omitted). In this case, the Court finds probable cause to believe that Ye Gon unlawfully possessed firearms under both federal and District of Columbia law.

Under federal law, the location, number, and nature[14] of firearms found in or beside the hidden room off Ye Gon's bedroom compel the inference that they were strategically placed there to be used to protect the vast quantities of money found in the same location. Possession of those firearms would therefore be a felony under 18 U.S.C. § 924(c). That law punishes the act of possessing a firearm in furtherance of a drug trafficking crime, which has been held to include the possession of firearms under circumstances suggesting that the weapons were strategically

---

[13] See Treaty, art. 2.

[14] One of the 9mm semi-automatic pistols had a silencer. Aff. ¶ 136; Apdx. D at D-46(b).

located to protect drugs and the illegal proceeds of drug trafficking.  See, e.g., United States v. Wahl, 290 F.3d 370, 375-77 (D.C. Cir. 2002).  For the same reasons, Ye Gon's constructive possession of the 9mm Pietro Beretta pistol found in his private office at Unimed, where bags of pseudoephedrine hydrochloride also were found, would also violate 18 U.S.C. § 924(c).  Finally, the pistol had an obliterated serial number, the possession of which would violate 18 U.S.C. § 922(k).

Under District of Columbia law, the possession of dangerous weapons, including "machine guns," is prohibited except for members of the U.S. military.  See D.C. Code § 22-4514(a) ("No person shall within the District of Columbia possess any machine gun . . . provided, however, that machine guns . . . may be possessed by the members of the Army, Navy, Air Force, or Marine Corps of the United States . . . ").  District of Columbia law thus has essentially the same effect as Mexico's law with respect to certain weapons; that is, members of the military may possess such weapons, but few others may do so.

For purposes of the prohibition on dangerous weapons, the term "machine gun" is defined in D.C. Code § 22-4501, which, in turn, adopts by reference the definition of "machine gun" in another regulatory provision, D.C. Code § 7-2501.01(10) ("'Machine gun' means any firearm which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.").  An AK-47 has been found to be a machine gun under another D.C. statute that incorporates the definition of "machine gun" contained in D.C. Code § 7-2501.01.  See District of Columbia v. Beretta U.S.A. Corp., No. 2000-CV-428B, 2006 WL 1892023, at *3 (D.C. Super. May 22, 2006) (finding that an AK-47 qualifies as either an "assault weapon" or a "machine gun" under the Assault Weapon

Manufacturing Strict Liability Act of 1990, D.C. Code § 7-2551.01 *et seq.*, a statute which adopts the definition of a "machine gun" found in D.C. Code § 7-2501.01).

IV.  The Evidence Submitted By Mexico is Sufficient and Properly Authenticated

    A.  Mexico's Evidence

The Court has reviewed the documentary evidence submitted by Mexico in support of its extradition request, which consists of the following:

1.  A diplomatic note 04507 from the Ambassador of Mexico to the Secretary of State.

2.  The Affidavit of Federal Public Prosecutor, Jorge Joaquin Diaz Lopez.  This document contains 148 numbered paragraphs detailing the evidence that the Mexican government has uncovered and collected in its investigation of the respondent.  The affidavit contains statements by Lopez that summarize what law enforcement agents found or learned from their sources of information and the statements given to his office or to other law enforcements agents.

3.  Appendices to Lopez's affidavit as follows:

    A.  Reproductions of the pertinent Mexican laws.

    B.  An Affidavit of an agent of the Federal Public Prosecutor who is a Mexican lawyer who explains the applicability of the pertinent statutes and the applicable statutes of limitation.

    C.  Exhibits D-1 through D-49 which are (1) documentary evidence and (2) statements of witnesses.  As to the latter, the agent states the following: "What follows are the reliable excerpts of the complete text of the witness'

30

statement and they are parts relevant to the request for extradition of ZHENLI YE GON. In the text of the statement extracts, where words were omitted, ellipses were inserted and sentences and paragraphs were formulated with grammatical changes to facilitate the reading thereof." Apdx. D at D-13, page 1 n.1.

        D.      Identification information pertaining to the respondent.

Ye Gon has suggested that the witness statements on which Mexico relies for its extradition request are unreliable because 1) they are only excerpted in the exhibits attached to the Mexican prosecutor's affidavit, 2) the excerpts have been edited by an unknown author, 3) there is no indication that the statements were made under oath, and 4) although all of the evidence formally submitted by Mexico has been translated into English, those translations were not certified.

These arguments utterly misstate the nature of what has been submitted by the Mexican government. First, the Mexican arrest warrant is not equivalent to an arrest warrant that I would issue, finding probable cause based on a sworn declaration by a police officer. Instead, it is an extraordinarily detailed set of findings of fact that is 641 pages long and contains hundreds of findings of fact based on the evidence given to a Mexican judicial officer who is not merely taking the attestation of a police officer and determining probable cause, but who is instead making detailed findings of fact as to relator's guilt of the crimes charged. It is much more like the findings of fact that an American judge would make after trial in accordance with Rule 52 of the Federal Rules of Civil Procedure. As such, it must be viewed as the judicial determination by a sovereign and signatory to a treaty. There is nothing in the treaty that requires that proof

submitted be of a particular kind, but all would agree that the treaty cannot possibly be interpreted to permit the requested states to render null and void judicial findings merely because the court that issued them choose to excerpt the statements of witnesses upon which it was relying as opposed to setting them forth in full and did not attach the complete sworn statements. That would be as irrational as a party's moving to vacate my findings of fact in a case before me simply because I chose to paraphrase a witness' statement, used quoted excerpts from it, and did not attach the complete statement to my findings. It is inconceivable that the signatory parties would intend that judicial findings sufficient in themselves in either country would somehow not be sufficient to warrant extradition from one to the other. Cf. Hazhiaj v. Hackman, 528 F.3d 282, 289-91 (4th Cir. 2008) (excerpts of Italian appeals court decision that contained detailed description of evidence against fugitive sufficed).

In this context, it is hardly surprising that federal courts have found that foreign indictments that contained detailed summaries of witness' statements and other evidence sufficient. See, e.g., Afanasjev v. Hurlburt, 418 F.3d 1159, 1163-66 (11th Cir. 2005) (unsworn 106-page foreign bill of indictment, which contained "detailed" summaries of witness statements and other hearsay evidence, was "sufficiently reliable evidence" on which to base probable-cause finding); Bovio v. United States, 989 F.2d 255, 259-61 (7th Cir. 1993) (investigator's sworn statement recounting evidence sufficient); Emami v. United States District Court, 834 F.2d 1444, 1447 (9th Cir. 1987) (affidavit detailing summaries of witness statements sufficient even if witnesses not under oath); Zanazanian v. United States, 729 F.2d 624, 627 (9th Cir. 1984) (summaries of witness statements and other evidence contained in police reports sufficed); United States v. Justik, No. 805MJ319TEAJ, 2005 WL 3185966, at *9-10 (M.D.Fla. Nov. 29,

2005) (finding probable cause based on description of evidence in foreign arrest warrant and summary report of evidence collected by prosecution). Surely, if these instruments were deemed sufficient, the judicial findings and summary of evidence provided by the Mexican prosecutor are sufficient.

In any event, the Court does not need to rely on the challenged excerpts. The same witness's statements are provided, in an unedited format, in the Mexican arrest warrant and although the warrant does not appear to contain complete statements for every witness, it does contain lengthy portions of the statements on which Mexico relies. Furthermore, the statements recounted in the warrant are not conclusory summaries whose reliability might be questioned; rather, they are detailed, first-person narratives of the activities on which the Mexican charges are based, made by persons who had first-hand knowledge of those activities. Such witness statements therefore constitute sufficiently reliable evidence.

Additionally, the Treaty does not require that witness statements be sworn in order to be received or credited. Collins, 259 U.S. at 317 ("unsworn statements of absent witnesses may be acted upon by the committing magistrate"). See also In re Sainez, No. 07-MJ-177, 2008 WL 366135, at *20 (S.D.Cal. Feb. 8, 2008) (Mexican extradition treaty does not require sworn statements therefore unsworn statements are permissible), habeas denied sub nom, Sainez v. Safford, 08-CV-819, 2008 WL 392564 (S.D. Cal. Aug. 25, 2008), denial aff'd, Sainez v. Venables, 588 F.3d 713 (9th Cir. 2009), cert. denied, 130 S.Ct. 3399 (2010).

Nevertheless, the United States represents that it has made available to the respondent's counsel copies of the original statements of the 16 witnesses whose statements were taken by the public prosecutor. I have examined them and asked the Court's official interpreter to translate

those portions that appear to me to be attestations of the truth by the witness of what we now know to be the complete statements.  The Court interpreter reviewed the witnesses' statements with me and explained me that each begins with a statement by Vazquez, the Public Prosecutor, that the witness appeared before him in a certain place and identified himself or herself by presenting a form of identification that displayed the witness' photograph.  The Public Prosecutor then advised the witness of her right to consult with an attorney and of the penalties that would attend her not telling the truth.  The witness statement then follows and at its conclusion, there appear the following words: "I attest that the above is a true account of my statement, wherefore I ratify and affirm it by duly signing below and on the margin."  This is followed by the witness' signature.  The invocation of the deity ("So help me God"), familiar to the common law, is not permitted under the Mexican constitution as a result of the anti-clerical aspects of its political system.  Specifically, the Mexican Constitution provides:

> A simple promise to tell the truth and to fulfill obligations that are contracted is binding on the one who so promises, and in the event of failure to do so, he shall be subject to the penalties that the law prescribes for this purpose.

Mexico Constitution Article 130.

A commentator explains:

> Since constitutionally Mexico is a secular state, any invocation to God, or any other expression of a religious creed, is not permitted at any official ceremonies. The same principle applies to the taking of an oath before Mexican courts or public authorities. Thus, Article 130 provides that a simple promise to tell the truth and to fulfill contractual obligations is legally binding on the individual. In the event of failure to do so, the individual in question shall be subject to the corresponding penalties imposed by the law.

Jorge A. Vargas, <u>Freedom of Religion and Public Worship in Mexico: A Legal Commentary on the 1992 Federal Act on Religious Matters</u>, 1998 B.Y.U. L. Rev. 421, 431 (1998).

In any event, all of the evidence submitted by Mexico has been authenticated in accordance with 18 U.S.C. § 3190, which requires simply that "the principal diplomatic or consular officer of the United States resident in such foreign country" certify as to the documents' authenticity. In this case, Buchholz submitted a sworn affidavit in which he declared the following:

> The documents submitted by the Government of Mexico in support of its extradition request were certified on May 29, 2008, by Edward McKeon, Minister Counselor for Consular Affairs at the U.S. Embassy in Mexico, in accordance with Title 18, United States Code, Section 3190. Mr. McKeon, at the time he certified the documents, was the principal consular officer of the United States in Mexico.

Buchholz Decl. at 2. Once that authentication has occurred, "[t]he usual rules of evidence do not apply" and the only requirement for admission of the evidence is that it be authenticated. Manta v. Chertoff, 518 F.3d 1134, 1146 (9th Cir. 2008). An objection therefore that unsworn statements are not admissible in extradition hearings is incorrect. Id.

Finally, although the Treaty provides that all documents presented under Article 10 must be submitted with a translation in the language of the requested country, it does not require that those translations be certified. See Treaty, art. 10(2)(5). "[T]ranslations must be presumed to be correct unless [the respondent] presents some convincing evidence otherwise." In re David, 395 F.Supp. 803, 806 (E.D. Ill. 1975); accord Ntakirutimana v. Reno, 184 F.3d 419, 430 (5th Cir. 1999) ("The extradition court need not independently inquire into the accuracy of the translations submitted with a formal extradition request, because such a requirement would place an unbearable burden upon extradition courts and seriously impair the extradition process.") (internal quotation marks and citation omitted).

Thus, there are before the court complete statements of witnesses, affirmed to be true in accordance with Mexican law and certified to be authenticated by a Department of State official. The respondent's objection on the grounds that the Prosecutor excerpted them is a meaningless quibble that is, in any event, incorrect; the witness' statements are complete and sworn to in perfect accordance with Mexican law.

V.    Non Bis In Idem

In analyzing whether the respondent can be extradited, two concepts must be distinguished, as they are premised on different treaty provisions and serve different interests.

As explained above, the obligation that the offenses charged "be punishable in accordance with the law of both Contracting Parties" (Treaty, Art 1) bespeaks an intention to subject a person to extradition only if the acts that are the premise of the request for his extradition are punishable in both the requested and requesting states. Sensi, 879 F.2d at 894. Under another provision of the treaty, however, "[e]xtradition shall not be granted when the person sought has been prosecuted or has been tried and convicted or acquitted by the requested Party for the offense for which extradition is requested." Treaty, art. 6.

Article 6 does not bar relator's extradition for several reasons. First, writing in May 2009, I indicated that the phrase "has been prosecuted" is in the past tense and could not apply merely because a prosecution had been commenced in the Producing State, the United States. In re Extradition of Zhenly Ye Gon, 613 F. Supp. 2d 92, 96 (D.D.C. 2009). Now, of course, the indictment in this Court has been dismissed with prejudice. Clearly, defendant was not tried and convicted or acquitted "for the offense for which extradition is requested." The question presented therefore is whether the phrase "has been prosecuted" would apply here, where an

indictment was returned and dismissed. Fortunately, that question need not be reached if the indictment in the United States did not charge "the offense for which extradition is requested."

In my May 2009 opinion, I found in the court of appeals' decision in Rezaq v. United States, 134 F.3d 1121, 1127-28 (D.C. Cir.), cert. denied, 525 U.S. 834 (1998), support for the proposition that the court of appeals would use the familiar Blockburger analysis in interpreting the prohibition in the Treaty against prosecution in the demanding state for the offense that had been prosecuted in the requested state. As will be recalled in Rezaq, the court of appeals concluded that the United States' prosecution was for an offense that contained elements that the Maltese authorities were not obliged to establish in their prosecution of the defendant. Rezaq, 134 F.3d at 1128.

Morever, the applicability of the Blockburger analysis to questions of prior prosecution was confirmed by the court of appeals in 2009 when, after applying the Blockburger analysis, it concluded that prosecution in the District of Columbia for a gun offense was not prohibited under the double jeopardy clause by a prosecution in Maryland of another offense involving the same gun because the elements of the crimes charged in the two jurisdictions were different. United States v. Kelly, 552 F.3d 824, 830 (D.C. Cir. 2009). Additionally, in United States v. Dixon, 509 U.S. 688 (1993), the Supreme Court overruled Grady v. Corbin, 495 U.S. 508 (1990) insofar as the court looked to a "same conduct" test of offenses rather than the Blockburger analysis when ascertaining whether prosecution for one offense barred prosecution for another. Thus, as a matter of the domestic law of the United States, one of the parties to the treaty, it could hardly be clearer that its courts would use the Blockburger analysis in ascertaining whether the offenses charged in the United States and the demanding state were the same. Given that

37

tradition, and the absence of any testimony from experts in Mexican law that Mexican law is decidedly to the contrary, the Blockburger analysis certainly seems to provide a controlling rule.

The respondent relies instead on the Second Circuit's decision in Sindona v. Grant, 619 F.2d 167 (2d Cir. 1980), in which the court did not use the Blockburger analysis but instead invoked Justice Brennan's concurring opinion in Ashe v. Swenson, 397 U.S. 436, 453-54 (1970), wherein he interpreted the Double Jeopardy Clause to require the prosecution "to join at one time all the charges against a defendant which grow out of a single criminal act, occurrence, episode[,] or transaction." Sindona, 619 F.2d at 178 (quoting Ashe, 397 U.S. at 453-54).

First, it is clear that Justice Brennan's concurring opinion did not survive the Supreme Court's decision in Dixon, that rejected a same conduct test for double jeopardy in favor of the Blockburger analysis. Thus, the theoretical underpinning of the Sindona decision–that as a matter of domestic law, a same conduct test defines the reach of the double jeopardy clause under American law–has not survived.

Second, it is important not to emphasize the now discredited dictum in the Sindona opinion over its holding. After all, the Second Circuit permitted the respondent's extradition on the grounds that the Italian prosecution was not for the same conduct for which he was to be punished in America:

> While believing that the standard to be applied in construing Art. VI(1) of the Treaty should be at least as broad as that expressed in Mr. Justice Brennan's concurring opinion in Ashe v. Swenson, supra, or in the Petite policy, we do not accept the conclusion Sindona would have us draw from it. Broadly speaking, the Italian prosecutor charged a gigantic fraud perpetrated on the Italian banks which generated funds that permitted Sindona to engage in allegedly criminal activities in Italy and other countries including the United States. The concern of the Republic of Italy is the harm done to depositors in the Italian banks; that of the United States is the

38

damage to American depositors and investors. The crimes charged in the American indictment, while serious, are on the periphery of the circle of crime charged by the Italian prosecutors. Although the alleged Italian crime may have been the "but-for" cause of the alleged American offenses in providing Sindona with the wherewithal, it is not the crime for which the United States is proceeding against him. Indeed, principles of territorial jurisdiction make it extremely doubtful that this country could proceed against Sindona for the overwhelming bulk of the matters being charged in Italy or that Italy could prosecute him for most of the charges in the American indictment. Article VI(1) of the Treaty could not have been intended to have the consequence that substantial elements of crime should be left unpunishable. We thus reject Sindona's argument that Article VI(1) confers immunity from extradition.

Sindona, 619 F.2d at 179. See also In Re: Extradition of Gambino, 421 F. Supp. 2d 283, 311 (D. Mass. 2006) (even a "same acts" or "same facts" interpretation in a non bis in idem context does not bar extradition when the Italian and American prosecutions differed in terms of the duration of the conspiracies, the quantities and dates of narcotics shipments, the geographical centers of the racketeering enterprises, the co-defendants, and the overt acts).

In my May opinion, I specified the differences between the Mexican and American charges:

> The Mexican charges are as follows:
>
> 1. Participation in organized crime, for the purpose of repeatedly committing drug crimes and operations with illegal funds;
> 2. Drug-related offenses in the forms of:
>     a. importation into Mexico of psycho tropic sub-stances, namely, N-acetyl pseudoephedrine acetate and ephedrine acetate, derivatives of pseudoephedrine,
>     b. transportation of psycho tropic substances, namely, N-acetyl pseudoephedrine, a derivative of pseudoephedrine,
>     c. manufacture of psycho tropic substances, namely, pseudoephedrine, ephedrine, pseudoephedrine

<div style="margin-left: 2em;">

         hydrochloride, and methamphetamine hydrochloride,

d.      possession of psycho tropic substances for
          the purpose of producing narcotics,

e.      diversion of essential chemical products, namely
          sulfuric acid, to produce narcotics;

3.      Violations of the Federal Law on Firearms and Explosives in
          the form of possession of firearms re-served for the
          exclusive use of the Army, Navy and Air Force; and

4.      Money laundering, by himself or through an in-termediary,
          by having custody of funds within Mex-ico, knowing that
          the funds have their source in an illegal activity, with the
          intention to impede knowledge of their source, location,
          destination, or ownership.

See Aff.  19; Apdx. A [Mexican arrest warrant] at 636-39.

The United States indictment, on the other hand, charges a single count of conspiring to aid and abet the manufacture of 500 grams or more of methamphetamine, knowing that it was to be imported into the United States from Mexico. United States v. Zhenly Ye Gon, Cr. No. 07-181, Indictment, Count One.

</div>

In re Extradition of Zhenly Ye Gon, 613 F. Supp. 2d 92, 97 (D.D.C. 2009).

     As I further noted in my May opinion, the American and Mexican crimes of conspiracy are comprised of different elements. Id. at 98.  Conspiracy under U.S. law requires proof of an agreement between the co-conspirators whereas conspiracy under Mexican law requires proof that the individual engaged in any of the specific acts identified in the law, such as the importation, transportation, or possession with the intent to distribute the controlled substance at issue. Id.  In addition, under Mexican law, a further showing must be made that the individual did not have permission from the Mexican government to perform the specific act. Id.

     Thus, as the Sindona case, the differences between the foreign charges and the American indictment clearly demonstrate that the respondent would not be punished for the same crime in Mexico as he would be for the crime charged in the American indictment.  Hence, his attack on

the Mexican government's request for his extradition fails, whether one uses what I believe to be the proper analysis, the Blockburger test, or the broader test suggested by the dictum in the Sindona case.

## CONCLUSION

Mexico has established probable cause for each of the charges for which extradition has been requested and met the other requirements for extradition under the Treaty. A Certificate of Extraditability and Order of Commitment will therefore be issued in conformity with these Findings of Fact and Conclusions of Law.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE